IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Carolyn K. LaFallett,                           :
                    Plaintiff                   :       Civil Action 2:08-cv-488

          v.                                    :       Judge Frost

Michael J. Astrue,                              :       Magistrate Judge Abel
Commissioner of Social Security,
                    Defendant                   :

## REPORT AND RECOMMENDATION

Plaintiff, Carolyn K. LaFallett brings this action under 42 U.S.C. §§405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security denying

her applications for Social Security Disability and Supplemental Security Income bene-

fits.  This matter is before the Magistrate Judge for a report and recommendation on the

administrative record and the parties' merits briefs.

**Summary of Issues.**  Plaintiff Carolyn K. LaFallett  maintains that she is disabled

due to high blood pressure, back problems, thyroid problems and depression. (R.  69.)

She was 60 years old the time of the administrative hearing.  The administrative law

judge found that LaFallett could perform her former job as a cashier as well as other

jobs that exist in significant numbers in the national economy.

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because:

- The administrative law judge erroneously found Plaintiff's bilateral carpal
  tunnel syndrome to not be severe.

- The administrative law judge failed to properly assign weight to the opinion of treating physician, Dr. Walter.

- The administrative law judge failed to find the claimant disabled as required by the medical-vocational guidelines.

- The administrative law judge failed to properly apply and develop the vocational expert's testimony.

**Procedural History.**  Plaintiff LaFallett filed her applications for disability insurance benefits and supplemental security income on August 24, 2004, alleging that she became disabled on May 1, 2004, at age 56.  (R. 61-63, 279-81.)  The applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On July 10, 2007, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 303-34.)  A vocational expert also testified.  On November 9, 2007, the administrative law judge issued a decision finding that LaFallett was not disabled within the meaning of the Act.  (R. 14-37,  R. 28-37 are duplicate.)  On March 31, 2008, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 5-7.)

**Age, Education, and Work Experience.**  LaFallett was born October 2, 1947.  (R. 61, 75.)  She dropped out of high school in the tenth grade to get married;  she has a limited education.  (R. 73, 121.)  LaFallett previously worked as a fast food cook and a cashier.  (R. 25, 70.)

**Plaintiff's Testimony.**  The administrative law judge fairly summarized LaFall-

The claimant testified at the hearing that she lives by herself in a house with two pet dogs. She said that she last worked in February 2003 as a cashier, a job that she held for five months. She also previously worked as a prep cook for a period of five years. She alleged at the hearing that she is disabled due to back pain, diabetes, hypertension, and hypercholesterolemia.

The claimant stated that she experiences a daily burning sensation in her low back. She indicated that she has a "joint belt" that helps to alleviate her discomfort a little bit. She has had epidural injections that relieved her pain for only a short period. She denied any benefit from physical therapy. She acknowledged that surgery has not been recommended for her back.

The claimant reported that she was diagnosed diabetes mellitus the week before the hearing. She testified that she is supposed to check her blood sugar once a day but she had not done it yet. She said that she has been prescribed medication.

The claimant stated that she has hypertension and elevated blood choles-terol. She initially reported that these conditions were controlled with medication but then alleged that her blood pressure and blood-lipid levels vary.

The claimant sees Dr. Walter, a physical medicine and rehabilitation phys-ician, every three months, and Dr. Ayub, her family physician, once every two months. She takes the medications listed in Exhibit 10E, including three narcotics for pain: Percocet, Oxycodone, and Lidoderm patch. She denied having any medication side effects.

The claimant estimated that she could walk for two hours at a time, stand for five to ten minutes at a time, sit for twenty minutes at a time, and lift no more than ten pounds. She testified that she is most comfortable when she is lying on her side. She said that she sleeps five interrupted hours at night after taking Percocet. She admitted being able to use her hands, arms, and fingers to get dressed and brush her hair. She also claimed that climbing stairs hurts her back.

The claimant also testified at the hearing concerning her activities of daily living. She has a valid driver's license and drives a car every other day or every two or three days. She stated that she performs some basic house-hold tasks such as cooking, washing dishes, doing laundry, and shopping. She indicated that she is visited by others, visits her sister in her home two times each week, and talks on the phone. She added that she goes out to eat once every three months. She reported that she gets together with a group of friends each year. She further testified that she crochets and reads the newspaper. She went on a car trip to Maryland with her son two years ago.

The claimant also briefly testified in response to some questions by her attorney. She said that she does not do gardening or lawn mowing any-more. In response to leading questions from counsel, she further alleged abdominal pain and stiff neck every once in a while but admitted that no surgery had been recommended. She also stated that she had not received injections of pain medication in her neck. She was further led to allege that she has scoliosis in her back which causes stiffness, that she has prob-lems walking on uneven ground, and that she loses her balance. When asked if she has problems climbing stairs, she indicated that she has weak legs. She was also led to say that she has pain in her legs once in a while. She complained of blurred vision which she attributed to her diabetes mellitus. However, she admitted that her vision improved when her prescription was changed. She denied having any psychological prob-lems.

The claimant did not appear to be in any distress at the hearing.

(R. 16-17.)

**<u>Vocational Expert's Testimony.</u>** The vocational expert present at the hearing was asked to assume an individual with Plaintiff's age, education and work experience who could perform at no more than the medium exertional level and was limited to inside work in a temperature-controlled environment, could perform low-stress jobs that did not involve inherently stressful or hazardous activities, and should not climb ladders or scaffolds, or work at unprotected heights. (R. 330-31.) The vocational expert

testified that this person could perform her past work as a fast food cook and cashier. (R. 331.) The vocational expert also testified that the individual could perform at least 35,000 unskilled, medium, regional jobs such as a hospital cleaner and linen room attendant and 20,000 unskilled, light jobs such as an information clerk and an office helper. (R. 331.) The vocational expert further testified that if the individual was limited to occasional bending, the jobs the individual could perform would be reduced to 10,000, unskilled, medium jobs, and 20,000, unskilled, light jobs. (R. 331.) Upon questioning by Plaintiff's attorney, the vocational expert testified that the individual would have a hard time retaining competitive work if the individual needed a rest period to lie on their side in order to relieve pain at least 15 minutes four times a day. (R. 333.)

**Medical Evidence of Record.** The relevant medical evidence of record is summarized as follows:

<u>Hafiz Ayub, M.D.</u> Plaintiff LaFallett initially saw Dr. Ayub in August 2004. She indicated her symptoms were abdominal and gynecological complaints, hypertension, fatigue, hyperlipidemia, and hypothyroidism. (R. 186-87.) Dr. Ayub completed a "Basic Medical" form and opined that LaFallett's standing/walking, sitting and lifting/ carrying were not affected and she had no significant limitations. She had moderate limitations in bending. Dr. Ayub concluded that she was "employable." (R. 184-85.)

X-rays of the lumbar spine taken on September 14, 2004, demonstrated subtle L5-6 disc space narrowing with mild scoliosis and spondylosis. (R. 193.)

On October 8, 2004, LaFallett underwent an upper GI endoscopic examination, which demonstrated benign-appearing esophageal stricture, hiatus hernia, and normal stomach and duodenum. (R. 117-19.)

On November 3, 2004, LaFallett underwent laparoscopic cholecystectomy for gallbladder disease. (R. 125-31.)

LaFallett began complaining of lower back discomfort on April 11, 2005. (R. 175.) Dr. Ayub periodically continued to provide primary care for LaFallett and medication refills though 2007. (R. 167-73, 261-64, 266-78.)

William D. Padamadan, M.D.  In November 2004, Dr. Padamadan conducted an evaluation of LaFallett for the Commissioner.  Her chief complaints included hypertension, thyroid replacement, and low back pain.  She walked into the examination without the use of ambulatory aids or limping.  Examination revealed no paraspinal muscle spasm, no specific area of tenderness, no tenderness over the SI joints, negative straight leg raising, intact knee and ankle jerks, no muscle wasting or fasciculation, 5/5 muscle strength, no sensory abnormalities in the legs or feet, normal gait, and was able to walk on heels and toes. She did have some decreased range of motion of the spine. LaFallett had normal range of motion of the upper extremities; no swelling or redness of the joints; and her hands were normal without clubbing, cyanosis, wasting of muscles or contractures.  LaFallett had normal grasps, manipulation, pinch and fine coordination.  LaFallett had normal range of motion of the lower extremities except for the knees, normal pulsations, and no ulcers or edema.  Dr. Padamadan diagnosed back pain

without objective findings of clinical abnormalities.  He concluded that LaFallett does not have limitations of physical activities.  (R. 132-38.)

John A. Walter, D.O.  On May 10, 2005,  Dr. Walter, a specialist in physical medicine and rehabilitation, evaluated Lafallett at the request of Dr. Ayub.  He continued to treat plaintiff through at least April 2007.  At the initial examination, LaFallett complained of an approximately 10 year history of low back pain.  (R. 158-59.)  She had good strength in the upper and lower limbs with the exception of some weakness; intact light touch sensation; reflexes at 3+; negative straight leg raise seated; positive straight leg raise supine; full and nonpainful hip and knee range of motion; reduced cervical range of motion; and functional range of motion through the upper limbs.  (R. 159.)  Dr. Walter recommended medication, physical therapy, and ordered an MRI of LaFallett's lumbar and cervical spine.  (R. 159, 235-38.)

An MRI of the lumbar spine taken May 16, 2005, showed degenerative disc and degenerative facet changes at L4-L5 and L5-S1, with mild canal stenosis and foraminal stenosis at L4-L5. (R. 161.)  An MRI of the cervical spine showed multilevel degenerative disc change with results in spinal stenosis at C3-C4, C4-C5, and C5-C6.  The radiologist noted the findings were most severe at C4-C5, where a posterior disc protrusion resulted in flattening of the cord.  There was mild foraminal stenosis on the right at C5-C6. (R. 162.)

In July 2005, Dr. Walter reviewed LaFallett's diagnostic tests and diagnosed lumbar degenerative disc disease/degenerative joint disease with probable underlying

mechanical facet mediated pain and cervical degenerative disc disease/degenerative joint disease without evidence of clear radiculitis. (R. 157.) Dr. Walter noted that La-Fallett's cervical "symptoms generally are rather minimal" and recommended monitoring. *Id.* With respect to her back complaints, he recommended bilateral L4-L5 and L5-S1 facet joint steroid injections and medication. (R. 157, 160, 174.)

On July 28, 2005, Dr. Walter stated his opinion that LaFallett could stand, walk, and sit for less than one hour each; could lift/carry less than 10 pounds; could never perform postural activities; and was unable to reach above shoulder level or use her hands repetitively for pushing and pulling. In addition, Dr. Walter reported that La-Fallett could use her hands repetitively for simple grasping and handling and fine manipulation and fingering. (R. 154-55.)

On August 24, 2005, LaFallett reported that the injections decreased her pain by 25% but she continued to have persistent pain and intermittent numbness in the cervical and left shoulder region, and discomfort in the lumbar spine. Examination revealed tenderness but intact sensation in the upper and lower limbs, 2+ reflexes and no sensory deficits. Dr. Walter adjusted her medication and recommended referral for a consultation for radio frequency ablation (RFA) procedures and TENS unit trial. (R. 156.)

That same day, Brian J. Oricoli, M.D., an associate of Dr. Walter's evaluated LaFallett for lumbar RFA. He reported that LaFallett had restricted lumbar range of motion with pain, but she was able to step up on her heels and toes without difficulty, had 5/5 strength in bilateral lower limbs without any focal deficits and unremarkable

seated straight leg raise. Dr. Oricoli performed the lumbar RFA procedures in October 2005. (R. 228-31.) LaFallett reported she did not receive any lasting relief from the RFA. (R. 223.)

LaFallett told Dr. Walter on October 19, 2005, that she did not get lasting relief with from the lumbar RFA procedures. She continued to report pain across the low back. Dr. Walter recommended a TENS unit and continued her on Zanaflex, Lidoderm and Vicodin. (R. 223.)

On December 14, 2005, it was reported that LaFallett did not respond to the trial TENS unit for her lower back pain. LaFallett noted it seemed to increase her back pain. She also reported increased pain and stiffness in her neck and persistent numbness and tingling in the right hand. Upon examination, LaFallett had 2+ reflexes of the upper limbs, discomfort with left shoulder range of motion, cervical tenderness, positive Hoffman's signs bilaterally, and normal gait. Dr. Walter continued her medication and recommended physical therapy for her neck complaints. They discussed surgery, but Dr. Walter noted LaFallett would not require surgery at that point because "things appear to be relatively stable". (R. 222.)

On January 25, 2006, LaFallett underwent an electrodiagnostic evaluation of her upper limbs to assess carpal tunnel syndrome, as well as any significant cervical radiculopathy. Results revealed evidence of left lower cervical stenosis without ongoing radiculopathy, and bilateral carpal tunnel neuropathy. (R. 221 and 256.) Dr. Walter said that the median neuropathy at the wrist "appears to be rather severe in nature,

9

somewhat worse on the left given the decreased amplitude noted." (R. 221.) Dr. Walter concluded that LaFallett should consider surgery. *Id.*

On April 28, 2006, LaFallett complained of constant numbness throughout both arms and hands and general weakness in her upper limbs. Dr. Walter diagnosed progressive cervical spondylosis/stenosis. (R. 218.)

LaFallett underwent a left carpal tunnel release in May 2006. (R. 216-17, 221.) On June 14, 2006, she noted a significant improvement with respect to her hand symptoms. On examination, Dr. Walter noted that LaFallett had some decreased cervical range of motion, cervical spine tenderness, 5/5 bilateral upper limb strength, 2+ reflexes throughout upper limbs, no light touch sensory deficits except for decreased sensation over the right thumb. LaFallett was continued on her medications. (R. 216.)

In August 2006, LaFallett continued to complain of persistent numbness in the right hand. It was indicated that she would need to schedule a carpal tunnel release on the right side in the future. (R. 215.)

In October 2006, LaFallett stated that the lumbar injections did not provide any lasting benefit and her pain medication did not provide adequate pain relief. Examination revealed decreased cervical range of motion, cervical and lumbar tenderness, 5/5 strength in upper and lower limbs, 2+ reflexes in the upper limbs, 1+ reflexes in lower limbs. She had decreased sensation over the right thumb and long finger. (R. 248.)

An MRI of the cervical spine taken October 30, 2006, showed a posterocentral disc herniation at C4-C5 and a posterior central disc protrusion at C5-C6 that resulted in

spinal canal stenosis with significant narrowing. (R. 239.)

Through April 2007, Dr. Walter noted that LaFallett's neck pain was relatively stable. She had no significant referral of symptoms in her upper limbs except for some weakness in the right thumb. She continued to report lumbosacral discomfort, but noted improvement with the RFA treatments. (R. 241, 243, 265.)

Doctors Hospital Nelsonville. An incomplete hospital record from September 13, 2005, shows LaFallett was seen in the emergency room after she fell from her porch hurting her left shoulder, left arm and right knee. X-rays of the left shoulder and fore-arm, and her ribs were negative for fracture or other abnormality. X-rays of the right knee revealed very mild hypertrophic changes but no fracture. (R. 164-65.)

LaFallett attended physical therapy between May 24, 2005 and February 1, 2006 for treatment of pain and decreased range of motion in her lower back and to recover from a shoulder injury. (R. 232-38.)

Keli A. Yee, Psy.D. LaFallett underwent a consultative psychological examina-tion with Dr. Yee on October 16, 2004. Dr. Yee diagnosed LaFallett with dysthymia and assigned LaFallett a global assessment of functioning (GAF) of 60. Dr. Yee opined that LaFallett's mental ability to withstand stress and pressure associated with day-to-day work activity is moderately impaired. (R. 120-123.)

Robelyn S. Marlow, Ph.D., and Roseann F. Umana, Ph.D., In December 2004 and April 2005, Drs. Marlow and Umana, psychologists, reviewed the medical evidence of record for the Commissioner. (R. 140-53.) They concluded that LaFallett's adjustment

disorder does not significantly affect her functioning.  (R. 152.)

**Administrative Law Judge's Findings.**  The administrative law judge found that:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2. The claimant has not engaged in substantial gainful activity since May 1, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following "severe" impairments: cervical and lumbosacral degenerative disc disease and dysthymia (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work.  However, she is limited to performing inside work in temperature-controlled environments and is precluded from climbing ladders, ropes and scaffolds or from otherwise working at unprotected heights.  She is also limited to performing low stress work which does not involve inherently stressful or hazardous activities.

6. The claimant is able to perform her past relevant work as a cashier II but is not able to perform her prior job as a fast food cook (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 2, 1947 and was fifty six years old, which is defined as an individual of advanced age, on the alleged disability onset date.  She is now sixty years old which is defined as an individual "closely approaching retirement age" (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in

English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering her age, education, work experience, and residual functional capacity, there are also other jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1,2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 18-27.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Analysis.** Step 2 of the sequential analysis – determining whether the claimant has a severe impairment – presents "a *de minimis* hurdle in the disability determination process.... Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The purpose of this very low evidentiary hurdle is to "screen out claims that are 'totally groundless.'" *Higgs*, 880 F.2d at 862 (quoting in part *Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 89-90 (6th Cir. 1985)). The *Higgs* Court characterized the dismissal of a disability claim at Step 2 based on medical evidence alone as "exceptional." 880 F.2d at 863.

The administrative law judge's decision addressed LaFallett's carpel tunnel syndrome as follows:

> The claimant also has very mild bilateral carpal tunnel syndrome. This condition was first noted by Dr. Walter in August 2006 and was later confirmed by EMG study taken in January 2006 (Exhibit 13F, page 17). Although she does have some mild carpal tunnel syndrome in both wrists, the extent of her symptoms and clinical findings to this point is clearly minimal. She has not required carpal tunnel release surgery to restore functioning in her hands nor is there any suggestion that such a procedure would be necessary or appropriate on the basis of the record currently before me. She is able to use her hands and arms to perform personal care tasks and there is no suggestion that her capacity for fine bilateral manipulation has yet been compromised in any way. On the record

> currently before me, there is simply no basis to conclude that the mild
> carpal tunnel changes could be considered a "severe" impairment for
> Social Security purposes.

(R. 19-20.) LaFallett contends that the administrative law judge erred by not finding

Plaintiff's carpal tunnel syndrome to constitute a severe impairment at Step 2 of the

sequential evaluation. Plaintiff emphasizes that the fact "The administrative law judge

relied upon the completely false statement that Plaintiff has not required carpal tunnel

release surgery to restore functioning nor is there any indication that the procedure

would be necessary or appropriate. (*Id.*) The record shows that Plaintiff had the pro-

cedure performed on her left wrist and treatment notes indicated it would be

appropriate to relieve symptoms in the right wrist. (R. 215-216). " *See* Doc. 9 at 6.

The administrative law judge incorrectly noted that LaFallett did not require

carpal tunnel release surgery to restore functioning in her hands. Plaintiff had surgery

on her left hand and the record indicates she was having persistent numbness in her

right hand as well, but surgery was to be scheduled in the future. (R. 215.) Also in

support of plaintiff's argument, a January 2006 EMG found bilateral carpal tunnel

neuropathy. (R. 221, 256).

Plaintiff further argues that the administrative law judge failed to fully develop

the record. This argument is without merit. In support of her argument, Plaintiff relies

on *Johnson v. Secretary of HHS,* 794 F.2d 1106, 1111 (6th Cir. 1986)). However, that case is

distinguishable from the present case. The Plaintiff in *Johnson* had obesity and the issue

dealt with whether he met the criteria for obesity to be considered a severe impairment.

The heightened duty for the administrative law judge to develop the record for the claimant applies only to cases where a claimant is not represented by counsel. *Ball v. Secretary of Health and Human Services,* No. 90-6059, 1991 WL 66051 *4 (6th Cir. Apr. 29, 1991), *citing, Lashley v. Secretary of health and Human Services,* 708 F.2d 1048 (6th Cir. 1983). Here, Plaintiff was represented at the hearing by an attorney. Plaintiff's claim that the administrative law judge erred by not further developing the record is without merit. *See, Ball, supra.*

Plaintiff also argues that the administrative law judge failed to have a medical expert present at the hearing to properly evaluate the extent of Plaintiff's carpal tunnel syndrome. The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, a who is not a medical professional, may understand. *See, Richardson v. Perales,* 402 U.S. 389, 408 (1972). The Commissioner's regulations provide that an administrative law judge "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404,1527(f)(2)(iii). This is not a complex case that required the use of medical testimony. An administrative law judge's decision whether a medical expert is necessary is inherently discretionary.

Treating Doctor: Legal Standard. A treating doctor's opinion on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff

on only one occasion or who has merely conducted a paper review of the medical evidence of record. *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). The treating doctor has had the opportunity to observe his patient's impairments over the course of time.

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. 423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length

of the relationship and frequency of examination; nature and extent of the treatment

relationship; how well-supported the opinion is by medical signs and laboratory

findings; its consistency with the record as a whole; the treating source's specialization;

the source's familiarity with the Social Security program and understanding of its

evidentiary requirements; and the extent to which the source is familiar with other

information in the case record relevant to decision. *Id.* Subject to these guidelines, the

Commissioner is the one responsible for determining whether a claimant is disabled. 20

C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given

to a treating source's medical opinion unless the opinion is well-supported by medically

acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-

maker must have "an understanding of the clinical signs and laboratory findings and

what they signify." *Id.* When the treating source's opinion "is well supported and not

inconsistent with the other substantial evidence in the case record, it must be given

controlling weight . . . ." The Commissioner's regulations further provide that the

longer a doctor has treated the claimant, the greater weight the Commissioner will give

his or her medical opinion.  When the doctor has treated the claimant long enough "to

have obtained a longitudinal picture of your impairment, we will give the source's

[opinion] more weight than we would give it if it were from a non-treating source. " 20

C.F.R. §404.1527(d)(2)(i).

The Commissioner has issued a policy statement about how to assess treating

sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The case law is consistent with the principals set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling.  *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th

Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).  The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).  The Commissioner must make the final decision on the ultimate issue of disability.  *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion.  LaFallett contends that the administrative law judge erred by accepting the opinion of a one-time consultative examining physician, Dr. Padamadan and treating family practice physician, Dr. Ayub,  over the opinion of LaFallett's treating physical medicine and rehabilitation physician, Dr. Walter.  LaFallett reasons, in part, that the administrative law judge failed to weigh Dr. Walter's opinion as required by the Regulations.

The Commissioner maintains that the administrative law judge properly evaluated the medical source opinions of record and correctly found that Dr. Walter's extreme opinion was unsupported by objective clinical findings and was inconsistent with other substantial evidence of record.

The administrative law judge based his assessment of LaFallett's residual functional capacity for a limited range of medium work on Dr. Ayub's October 2004 opinion

and Dr. Padamadan's opinion of November 2004. (R. 28.) The administrative law judge explained:

> The above restrictions limiting the claimant to a reduced range of medium level work represent a synthesis of the assessments of the claimant's family physician, Dr. Ayub, the BDD consultative examiner of record, Dr. Padamadan, and the electrodiagnostic testing of record. Neither Dr. Ayub nor Dr. Padamadan found evidence of any potentially disabling limitations on the claimant's capacity for basic work activity. Dr. Ayub filled out a Basic Medical form on October 15, 2004, in which he indicated that the claimant could sit, stand, walk, and lift without limitation and that she was only "moderately" limited in her ability to bend. Dr. Ayub concluded that she was "employable." Similar findings were reported by the BDD consultative examiner of record in this case, Dr. Padamadan (Exhibit 5F). He too noted only minimal findings relating to any possible vertebrogenic disorder. She had a normal gait at that time and did not use any ambulatory aids. Range of motion studies showed normal cervical motions and only a slightly reduced range of motion in her lumbar spine. Motor strength was 5/5 and there was no evidence of any neurological component to her back pain. Dr. Padamadan concluded that she was able to sit, stand, and walk without limitation and that "[h]er upper extremity functions for reaching, handling, and fine and gross movements [were] intact." Dr. Padamadan concluded that he did "not see any indication for limitation of physical activities." While I recognize that the assessments submitted by Drs. Ayub and Padamadan are consistent with the ability to perform the full range of work activity, the MRI evidence of record does show evidence of multi-level cervical and lumbosacral changes which are most acute at the C4-C5 level. The restrictions I have imposed limiting the claimant to medium level work represent a reasonable synthesis of this evidence. Additional restrictions limiting this person to inside work in temperature-controlled environments are also appropriate since exposure to temperature extremes may exacerbate the degenerative arthritic changes in her spine. Further restrictions precluding her from climbing ladders, ropes and scaffolds or from otherwise working at unprotected heights are also appropriate in this case as a prophylactic measure to prevent injury to herself due to her mild loss of lumbar range of motion.

(R. 21). The Administrative law judge rejected Dr. Walter's opinion as follows:

> The medical evidence of record also includes a physical residual function-

al capacity assessment Dr. Walter signed for the attorney on July 28, 2005 (Exhibit 7F, pages 1-2). In that assessment, Dr. Walter indicated that the claimant could stand, walk, or sit for a total of just one hour each during a normal workday and that she could lift less than ten pounds. The record reflects that Dr. Walter saw this patient on only three occasions, May 10, July 6, and July 19, 2005, before rendering this severely limiting assessment for counsel (Exhibit 7F, pages 3-10). He did not have a long term longitudinal treatment history at the time his assessment was rendered. Dr. Walter's assessment is also inconsistent with the essentially conservative treatments he rendered to the client including facet injections, the use of TENS unit, and physical therapy. He did not recommend back surgery, refer the patient to an orthopedist, or provide any other care commensurate with the level of functional limitation espoused in the July 2005 residual functional capacity assessment. Moreover, Dr. Walters portrayed his patient as essentially bedfast in that he stated that she could be either on her feet or sitting for a total of no more than three hours per day. This level of functional limitation is certainly inconsistent with the remainder of the medical evidence of record and especially with the claimant's demonstrated level of day to day functioning. For these reasons, I am compelled to afford greater weight to the assessments of Drs. Ayub and Padamadan, both of whom believed that the claimant's capacity for day to day work activity remained essentially intact.

(R. 21-22).

LaFallett is correct that the administrative law judge erred by only applying the standards to determine if Dr. Walter's opinion was entitled to controlling weight under the treating physician rule and failed to apply the remaining factors required by the Regulations.

The Regulations require controlling weight to a treating physician's opinion only when it is both well supported by medically acceptable evidence and not inconsistent with other substantial evidence of record. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th

Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2). Because the administrative law judge applied these factors to Dr. Walter's opinion, the administrative law judge did not err as a matter of law in declining to give controlling weight to Dr. Walter's opinion.

However, the administrative law judge erred as a matter of law by not continuing to weigh Dr. Walter's opinion under the remaining factors of the Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544. The administrative law judge did not specifically refer to any of these factors or to the Regulations, 20 C.F.R. §404.1527(d)(3)-(5), when weighing Dr. Walter's opinion. Speaking through her Ruling, the Commissioner instructs:

> Adjudicators must remember that a finding that a treating source's medical opinion is not well-supported by medically acceptable clinical and laboratory techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527.... In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p. Because the administrative law judge did not heed this instruction or the requirement of the Regulations, his evaluation of Dr. Walter's opinion was based on an error of law.

This was not harmless error because the record contained two MRIs of LaFallett's cervical spine, both showing spinal stenosis at C3-C4, C4-C5, and C5-C6. (R. 162, 239.) and one MRI of her lumbar spine showing degenerative disc and degenerative facet changes at L4-L5 and L5-S1, with mild canal stenosis and foraminal stenosis at L4-L5 (R. 161,) along with other treatment received by Plaintiff while under Dr. Walter's care, including epidural injections and the lumbar radio frequency ablation procedure from Dr. Oricoli.  (R. 228-31.)  This was also not harmless error because the medical source opinion by Dr. Padamadan upon which the administrative law judge relied, was also not assessed under the factors required by the Regulations, particularly the factor of "supportability." *See* 20 C.F.R. §404.1527(d)(3), (f); *see also* Social Security Ruling 96-6p. This factor specifically provides in part: "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give to that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion...." 20 C.F.R. §404.1527(d)(3).  Application of this factor was necessary because as Plaintiff notes, neither of the medical opinions that the administrative law judge relies upon had the opportunity to make their assessment with knowledge of the complete medical record (including the results of the diagnostic testing of Dr. Walter).  *See* Doc. 9 at 8.  Given this conflict, it was essential for the administrative law judge to explain why he credited Dr. Padamadan's and Dr. Ayub's opinions.  Why, then, did the administrative law judge find Dr. Padamadan's opinion more deserving of weight than Dr. Walter's opinion with

the results of these MRIs? A review of the administrative law judge's decision leaves this question unanswered. *See* R. 21-22. The administrative law judge simply accepted Dr. Padamadan's assessment of LaFallett's physical abilities as he did "not see any indication for limitation of physical activities." (R. 21.) More explanation was needed because Dr. Padamadan supported his assessment only with clinical findings and did not refer to any x-rays, EMGs, MRIs or other medical test evidence. *See* 20 C.F.R. §404.1527(d)(2)-(5), (f); *see also* Social Security Rulings 96-2p, 96-6p.

Accordingly, LaFallett's challenges to the administrative law judge's evaluation of medical source opinions are well taken.

Medical-Vocational Guidelines: Legal Standard. Where a claimant suffers from an impairment limiting only his strength, the Commissioner can satisfy his burden, without considering direct evidence of the availability of jobs the particular claimant can perform, through reference to the Grid. *Abbott v. Sullivan,* 905 F.2d 918, 926 (6th Cir. 1990). The Grid aids the Commissioner in determining disability claims by allowing "administrative notice" to be taken of the existence of jobs in the national economy that those with particular combinations of the four statutory factors are capable of perform-ing. *Id, citing, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 529 (6th Cir. 1981), *cert. denied,* 461 U.S. 975 (1983). The Grid is composed of sections numbered 201.01 through 203.31, each of which specifies whether a claimant with a particular combination of the four factors listed in the Act will be found disabled or not disabled. *See, Id.* The Grid takes into account only a claimant's exertional impairment; that is,

one which manifests itself by limitations in meeting the strength requirements of jobs. *Abbott, supra.* (citation omitted). Where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, rote application of the Grid is inappropriate. *Id.* (citations omitted). In the case of an individual who suffers from both exertional and nonexertional impairments, where the Grid does not yield a finding of "disabled" when the exertional impairments are considered alone, the Grid may be employed as a "framework" to provide guidance. *Id.* (citations omitted). With respect to exertional impairments, the correct disability decision is found by locating the claimant's specific vocational profile within the Grid sections. *See,* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §200.00.

Medical-Vocational Guidelines: Discussion. LaFallett contends that the administrative law judge erred by not applying the Grids as a framework for his decision because considering Plaintiff's age, education, work experience, and proper residual functional capacity, the Administrative law judge should have found Plaintiff disabled according to 201.02 of the Medical-Vocational Guidelines. Because this contention hinges on an issue not properly resolved at this point in the case – whether or not Dr. Walter's opinion was entitled to more weight than the other medical source opinions of record – LaFallett's reliance on the Grids in this case lacks merit. This conclusion, however, should not be read as a complete rejection of LaFallett's reliance on the Grids because if Dr. Walter's opinion is fully credited on remand, the Grids will mandate the conclusion that LaFallett's is under a disability. *See* 20 C.F.R. Subpart P, Appendix 2,

Plaintiff also argues that the Administrative law judge erred by ignoring the vocational expert's complete and actual testimony. *See* Doc. 9 at 12. Since it is recommended that the administrative law judge's decision be reversed for failure to properly weigh the medical source opinion and to consider whether LaFallett's carpel tunnel syndrome constituted a severe impairment, I will not address this argument. The Magistrate Judge RECOMMENDS that this case be REMANDED to permit the administrative law judge to consider the combined impact of LaFallett's cervical and lumbosacral degenerative disc disease and carpel tunnel syndrome.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **REMANDED** to properly evaluate the opinion of Dr. Walter and assess whether LaFallett's carpel tunnel syndrome was a severe impairment.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See*

*also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

  s/Mark R. Abel             
United States Magistrate Judge